**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON**

CIVIL ACTION NO. 21-45-DLB-CJS

TYRA WELLS and JEFFREY JARRELL                                                        PLAINTIFFS

v.                      **MEMORANDUM OPINION AND ORDER**

THOMAS C. RICE                                                                             DEFENDANT

\*\*\* \*\*\* \*\*\* \*\*\*

This matter is before the Court upon Defendant Thomas C. Rice's Motion for Summary Judgment. (Doc. # 29). Plaintiffs Tyra Wells and Jeffrey Jarrell filed their Response and Rice filed his Reply. (Docs. # 30 and 32). The Motion is now ripe for review. For the reasons stated herein, Defendant's Motion for Summary Judgment (Doc. # 29) is **granted in part** and **denied in part**.

**I.   FACTUAL AND PROCEDURAL BACKGROUND**

This is a § 1983 action for First Amendment retaliation brought by two citizens of Maysville, Kentucky against a Maysville police officer. In the context of nationwide protests and riots in the spring of 2020 following George's Floyd death at the hands of a Minneapolis police officer, citizens of Maysville held their own protest. (Docs. # 29 at 1 and 30 at 2).[1] The protest was entirely peaceful and ended before evening. (Doc. # 29 at 2). But at 11:00 p.m., another crowd gathered, and this time a "heated verbal altercation" broke out among the protest's younger participants. (*Id*. at 1). The City of

---

[1] The parties largely agree on the facts of the case. For brevity and clarity, the Court will primarily refer to the Motion for Summary Judgment for the facts, except where necessary to elaborate on disagreements.

1

Maysville dispatched Officer Rice, the Defendant here, to monitor the scene. (Docs. # 29 at 1 and 30 at 2).

When Rice arrived on scene, he approached Plaintiff Jarrell—a childhood friend—and asked him about the gathering. (Doc. # 29 at 2). Jarrell answered, and the two remained talking and watching the crowd. (*Id.*). They discussed the relative youth of many of the protestors, the disrespect demonstrated, and the fact that their parents were not present. (*Id.*). At this point, Rice stated that "this is why we've got officers kneeling on necks."[2] (*Id.*; Doc. # 30 at 2). Angered by this comment, Jarrell walked away. (Doc. # 29 at 2).

A few days later, unable to forget Rice's comment, Jarrell related the story to his aunt, Tyra Wells. (*Id.*). Wells then posted the following statement on Facebook:

> My heart is so heavy!! A so-called cop, who I thought was a friend of mine had the audacity to say, "That's why they get the knee" after responding to an incident where a white man called girls "hoes" and "niggers!" WE KNOW WHO YOU ARE! I will definitely delete you and also confront you when I see you!! I know your fellow officers also know about what you said and who you are as a person. It's sad that the people who heard you didn't say anything that night…maybe he/they were afraid the situation would get worse!![3] But I won't be silent!! Maysville stand with me! No more crooked cops! #Blacklivesmatter

(*Id.* at 2-3). The post received many "likes" and comments, including from Wells and Jarrell. (*Id.* at 3; *see also* Doc. # 29-2 (screenshots of the post and its comments)). Although she did not initially name Rice in the post, Jarrell disclosed Rice's name in the

---

[2] The parties hotly dispute what Rice meant by this comment and the nature of the context in which it was said. The Court will not address that dispute because it is not directly relevant to resolving this Motion for Summary Judgment. The speech giving rise to this lawsuit, Officer Rice's allegedly threatening and retaliatory comments, were made later.

[3] At this point, Wells included a red-faced "angry" emoji, which does not render in the Court's word processing software. (*See* Doc. # 29-1).

2

comments after multiple requests from commenters, including one that demanded he be named so they could "put him on blast." (*See* Doc. # 29-2).

Rice called Wells—a longtime acquaintance and friend—later that day and asked her to take down her post, which she declined to do. (Doc. # 29 at 3; *see also* Doc. # 32 at 5). He called again with the same request three days later, adding that he would file a civil suit if she refused. (Doc. # 29 at 3.). Wells informed her brother of Rice's call, and her brother called Maysville's Chief of Police, Jared Muse, to request a meeting. (Doc. # 30 at 5). Chief Muse scheduled one for two days later. (*Id*.).

At the June 15 meeting, which Rice did not attend, Wells and her brother discussed the situation with Chief Muse. (*Id*. at 6; Doc. # 29 at 3). Nothing notable happened at the meeting, but Rice filed a defamation lawsuit in Mason Circuit Court that day against Jarrell, Wells, and two other defendants. (Doc. # 30-4). None of the parties received service, Rice voluntarily dismissed the suit two days later, and none of the Defendants were apparently ever aware of the lawsuit until this litigation. (Docs. # 32 at 4 and 27 at 59-60). Chief Muse referred Rice to the attorney he eventually hired, and suggested he file the suit. (Doc. # 30 at 6).

The parties met again the next day, June 16, this time with Rice and the Mason County Attorney also present. (Doc. # 29 at 3). The meeting began with a discussion of Rice's comment at the protest and the context in which it was said, about which the parties vehemently disagreed. (*Id*. at 3-4). The meeting quickly devolved into shouting and obscenities when Rice brought up a derogatory comment Wells had allegedly made about an unidentified individual at the grocery store. (*Id*.; Doc. # 30 at 8). Wells became incensed at the "off topic" comment. (Doc. # 29 at 4). At this point, Rice, pointing his

finger at Wells and Jarrell, stated, "I'll tell you this, and I'm not going to hold any punches here, if somebody harms one hair on my wife or any of my kids, if anybody harms one hair on their head, I'm coming for you and I'm coming for you."  (Doc. # 26 at 47).  According to Wells, at this point Jarrell jumped up yelling, "[Y]ou ain't threatening my disabled auntie, fuck you, get out of here." (Doc. # 25 at 62).  Chief Muse escorted Rice out of the room and Wells and Jarrell asked for complaint forms.  (*Id*.).  Rice claims that he made this demand out of fear for his family's safety given the volatile political climate and Jarrell's past wanton endangerment charge for putting a gun in a woman's face. (Doc. # 29. at 4).  The County Attorney said that it was "the stupidest thing [Rice] could have done."  (Doc. # 25 at 62).

After the meeting, Chief Muse placed Rice on paid administrative leave until the matter was investigated.  (*Id*.).  Rice was found to have violated three city ordinances, including "making statements to citizens that could be perceived as a threat during a meeting," "making inappropriate statements that could be perceived as threatening while meeting with citizens," and "repeatedly making inappropriate and hostile statements to citizens after being told by the Chief of Police to refrain from making such remarks." (Doc. # 30 at 9).  Chief Muse recommended a penalty of 20 days of suspension without pay and assessment by a therapist for anger and stress-related problems.  (*Id*. at 10).  Rice accepted the recommended discipline.  (*Id*.).

Wells and Jarrell filed this action for First Amendment retaliation based on Rice's comments at the meeting with Chief Muse.  They argue that his threat to file—and actual filing of—a defamation lawsuit based on Wells's Facebook post and his comment that he was going to "come for them" constituted retaliation for Plaintiff's protected speech.  (Doc.

4

# 1). Rice disagrees and filed this Motion for Summary Judgment. (Doc. # 29). He argues that Plaintiffs have failed to make a prima facie case because (1) Wells' Facebook post was incitement, not protected speech, (2) he filed the lawsuit in his personal capacity and does not lose access to the courts by virtue of his government employment, (3) his comments at the meeting were too vague to be taken as an actual threat, (4) there is no causal connection between his statements and any harms suffered, and (5) he is entitled to qualified immunity. (*Id*.). In their response, Wells and Jarrell argue that (1) the Facebook post was protected speech because it was legitimate criticism of a government official, (2) the lawsuit qualifies as adverse action for First Amendment purposes regardless of whether filed in an official or individual capacity, (3) Rice's threats at the June 16 meeting caused Wells and Jarrell to fear for their safety, (4) this behavior was a direct response to Wells's Facebook posts, and (5) Rice is not entitled to qualified immunity because it is clearly established that police may not threaten people for their protected political speech. (Doc. # 30). Rice replies that, among other things, his threat at the June 16 meeting was "made for personal reasons, not as state action." (Doc. # 32 at 5).

For the reasons that follow, Rice's motion for summary judgment on the issue of his personal lawsuit will be **granted**, his motion for summary judgment on the issue of his statements at the June 16 meeting will be **denied**, and his request for qualified immunity will also be **denied.**

II.   ANALYSIS

   A.   **Standard of Review**

Summary judgment is appropriate "if the movant shows that there is no genuine

5

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment "bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. American Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008) (citing *Plant v. Morton Int'l Inc.*, 212 F.3d 929, 934 (6th Cir. 2000)). In deciding a motion for summary judgment, the Court must draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Following the Court's review of the record, if a "rational factfinder could not find for the nonmoving party, summary judgment is appropriate." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

### B. The Motion for Summary Judgment

The standard for establishing a First Amendment retaliation claim is clear, and both parties agree on its elements. These claims are evaluated under a burden-shifting framework that requires Wells and Jarrell to establish a prima facie case that they (1) they engaged in protected speech, (2) suffered adverse governmental action, and (3) the adverse action was motivated at least in part by the protected speech. *See Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012) (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)). Once they make that case, the burden shifts to Rice to prove that the adverse action would have occurred regardless of the Plaintiff's speech. *Id.* At this point, the court grants summary judgment if "no reasonable juror could fail to return a verdict for the defendant." *Id.* (quoting *Eckermann*

6

*v. Tenn. Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010)).  Rice argues that Wells and Jarrell have failed to make a prima facie case.

Although pleaded in a single count, the Complaint alleges that Rice retaliated against Wells and Jarrell at two points: when he threatened to file a lawsuit and later did so, and when he told Plaintiffs that he would "com[e] for them" if anything happened to his wife and children as a result of their speech.  (Doc. # 30 at 16).  The parties dispute every element of the prima facie case, so the Court will evaluate each element in turn.

### 1. The Facebook Post as Protected Speech

Wells argues that her June 10 Facebook post describing Rice's comments at the protest is a legitimate and protected criticism of government officials.  (Doc. # 30 at 13-16).  Rice claims it is a thinly veiled incitement to violence against himself and functioned as a platform for others to voice similar threats.  (Doc. # 29 at 6-9).  Wells is right; her speech is protected under the First Amendment.

Our Constitution protects the right of all citizens to speak their minds on matters of public concern freely, and without prior restraint or interference from the government. *Holzemer v. City of Memphis*, 621 F.3d 512, 520 (6th Cir. 2010) ("We have . . . clearly stated that private citizens have a First Amendment right to criticize public officials and to be free from retaliation for doing so.").  But it does not protect a right to incite others to violence.  *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 572 (1942).  The difference between the two is determined by examining whether (1) "the speech explicitly or implicitly encourage[s] the use of violence or lawless action," (2) the speaker intends that his speech be understood this way, and (3) "the imminent use of violence or lawless action is the likely result."  *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 246 (6th Cir.

7

2015).

It is notoriously difficult to determine when speech descends from political speech—even impassioned speech—to incitement. *Id*. at 244. But one thing is clear: "[t]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Ashcroft v. Free Speech Coal*., 535 U.S. 234, 253 (2002). "[S]peech that fails to specifically advocate for listeners to take 'any action' cannot constitute incitement." *Bible Believers*, 805 F.3d at 245 (quoting *Hess v. Indiana*, 414 U.S. 105, 109 (1973)). Even speech that advocates for future violence or unlawful action is constitutionally protected if the actions are to take place at "some indefinite future time." *Hess*, 414 U.S. at 108. Therefore, the threat of lawless action must be both *imminent* and *likely*. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) ("[The Constitution does] not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."). Even a protestor who yells "We'll take the fucking street again" after being ordered off the street by police as part of a large and noncompliant crowd is protected by the First Amendment. *Bible Believers*, 805 F.3d at 244-45. There must be specific advocacy of a specific action at a specific time. *Id*.

Tyra Wells's Facebook post was protected criticism of Maysville police generally and Officer Rice specifically. Nothing in her post advocated any kind of physical or violent action be taken against Rice or insinuated that others should do so. (Doc. # 29-1). First, the post relates the incident from her perspective, and then states that she knows who the speaker was, without disclosing his name. (*Id*.). Her post conveys her deep disappointment that a police officer "who I thought was a friend of mine" made this

8

comment. (*Id*.). After stating that she knows who the officer is, she says that she will "definitely delete you and also confront you when I see you!!" (*Id*.). In the context of a social media conversation, to "delete" someone generally means to remove them as a "friend" on a profile. (*Id*.); see also Marlon Jiminez-Compton, *Somebody Unfriended You On FB. Big Deal?*, Nov. 2, 2015, at https://www.linkedin.com/pulse/somebody-unfriended-you-fb-big-deal-marlon-jimenez (as an example of this colloquial description). This action carries a strong social message of cutting off friendship and communication but is not violent in any way. She also threatens to "confront" Rice. (Doc. # 29-1). Citizens have an absolute right to criticize their government and confront its employees without obstruction or violence. Wells has been wheelchair-bound since 1996 because of polio (Doc. # 30 at 2, 13); it strains credulity, even out of context, to read her promise to "confront" Rice as anything other than protected political speech. Finally, she expresses disappointment that other officers said nothing and assures her readers that the city's citizens will stand up against this kind of conduct. (*Id*.). Again, read through the lens of the caselaw, there is no indication here of a threat, or even a veiled threat. *Bible Believers*, 805 F.3d at 246. It is possible that others may have read her story and decided to take their own violent actions but "[t]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Free Speech Coal.*, 535 U.S. at 253. "The hostile reaction of a crowd does not transform protected speech into incitement." *Bible Believers*, 805 F.3d at 246. Therefore, Wells's Facebook post was protected speech, and the first element of her prima facie case is satisfied.

Jarrell's disclosure of Rice's name is similarly protected. The caselaw on incitement is clear that there must be an imminent and likely threat of violence as a direct

and intended result of speech. *Brandenburg*, 395 U.S. at 447. Wells's post generated 117 comments and 90 reactions as of the time the screenshot attached to the Motion for Summary Judgment was taken. (Doc. # 29-2). All are angry, but only one comes anywhere close to hinting at anything other than social or employment consequences for Rice. One commenter stated that "we can['t] collectively no longer mess with them" if the officer is not named. (*Id*. at 1). Another states that they want to know who it is so that they don't talk to him. (*Id*. at 2). A third expresses a desire to "put him on Blast." (*Id*.). Again, this colloquially means to subject someone to a barrage of negative internet or real-life social pressure as a result of their actions; it is not necessarily a call for violence. *See, e.g.*, "What does "Put on Blast" mean?", Later Social Media Glossary, at https://later.com/social-media-glossary/put-on-blast/. A fourth commenter stated that unless Rice was named, "he will feel the need to continue allowing the things that happened that night . . . to happen over and over again." (*Id*.). After Jarrell named Rice, subsequent comments expressed a lack of surprise that Rice was the individual discussed in the original post. (*Id*.).

The only comment that could possibly be read as a threat of physical violence was one comment that stated, "The knee on our necks ain't gonna be NOTHING like what he has to deal with in the end!!!" (*Id*.). While this comment could be read to hint at future planned violence against Rice that would be worse than a knee on his neck, it still falls short of the *Brandenburg* standard for incitement. *Brandenburg*, 395 U.S. at 447. And even if it were a threat to violence, it would not convert Wells's original post or Jarrell's disclosure of Rice's name into unprotected speech. "The hostile reaction of a crowd does not transform protected speech into incitement." *Bible Believers*, 805 F.3d at 246.

10

Therefore, Jarrell's comment disclosing Rice's name is speech protected by the First Amendment, and the first element of the prima facie case is established.

### 2. Adverse Action

Next, Wells and Jarrell must show that they suffered an adverse action because of their protected speech. They allege two examples of adverse action: first, that Rice filed a lawsuit against them, and second that he threatened them at the June 16th meeting. The Court will address each in turn.

The term "adverse action" derives from employment law and brings with it a lot of the same connotations. *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999). The Sixth Circuit has adopted the Seventh Circuit's standard from *Bart v. Telford*, 677 F.2d 622 (7th Cir. 1982) for evaluating the existence of an adverse action. *Thaddeus-X*, 175 F.3d at 396-97. Because "there is no justification for harassing people for exercising their constitutional rights, [the action] need not be great in order to be actionable." *Bart*, 677 F.2d at 625. However, the action must inflict more than a *de minimis* harm; it must be one that would "deter a person of ordinary firmness" from exercise of their rights. *Id*. This standard can encompass perfectly legal governmental actions which are nevertheless "motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *MacIntosh v. Clous*, 69 F.4th 308, 316 (6th Cir. 2023) (quoting *Thaddeus-X*, 175 F.3d at 386). The Sixth Circuit has often found "that when an official responds to speech with threats of physical harm, that response constitutes an adverse action that would deter a person of ordinary firmness from speaking." *Id*.; *see also Zilich v. Longo*, 34 F.3d 359, 364-65 (6th Cir. 1994).

### i. Rice's Lawsuit

After Tyra Wells posted her comments on Facebook, Rice called her and demanded that she take down the post. (Doc. # 29 at 3). She did not. He then called again three days later, this time threatening a civil lawsuit if she did not remove the post. (*Id*.). On June 15, he filed the promised defamation lawsuit in Mason Circuit Court. (*See* Doc. # 30-4). Two days later, he voluntarily dismissed it before service was effectuated. (Doc. # 32 at 4). Wells and Jarrell did not even know about the lawsuit. (*Id*.). They now argue that this constituted "adverse action" taken against them as retaliation for their speech criticizing Rice and the Maysville Police Department.

Rice's lawsuit is not an adverse action for two reasons. First, it was not a state action; government employees do not lose access to the legal process by virtue of their employment. Second, even if it was an adverse state action, because Wells and Jarrell were not aware of the suit until much later, it was not a deterrent to them exercising their rights. *Bart*, 677 F.2d at 625.

Wells and Jarrell cite numerous cases where police officers were held to have acted under color of state law. (Doc. # 30 at 17). To begin with, they correctly note that the analysis looks at the nature of the act performed and not external factors such as clothing or employment status. (*Id*. (quoting *Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001)). They then point to major Sixth Circuit cases that hold police officers "act[]under color of state law when [they] purport[] to exercise official authority." (Doc. # 30 at 17). "Such manifestations of official authority include flashing a badge, identifying oneself as a police officer, placing an individual under arrest, or intervening in a dispute between third parties pursuant to a duty imposed by police department regulations."

12

*Memphis, Tennessee Area Loc., Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 903 (6th Cir. 2004).  Wells and Jarrell argue the filing of the lawsuit was state action because Rice became aware of the of the Facebook post through Chief Muse, Muse and Rice met with Plaintiffs to discuss the post, Rice demanded the post be taken down, and because Chief Muse referred Rice to the attorney he eventually used, the filing of the lawsuit was state action.

This argument errs because the filing of a civil lawsuit is not dependent on the exercise of any power "possessed by virtue of state law and made possible only because the wrongdoer is clothed by the authority of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).  Thus, it is not an action taken under color of state law, or state action.  *Id*.  As Rice points out repeatedly in his filings, he does not lose access to the courts just because he is a public servant.  (*See* Doc. # 32 at 3).  All the cases cited by Wells and Jarrell involve police officers using powers that they do not possess as private citizens—powers wholly derived from their position as agents of the state.  (*See* Doc. # 30 at 17).  When an officer sees or hears speech he disagrees with and then arrests or detains the speaker, files charges, or otherwise suppresses the speech using the powers of his office, that would be action taken under color of state law.  *See West*, 487 U.S. at 50 ("[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law.").  But the filing of a defamation lawsuit against a speaker because of their allegedly false public characterizations of him is not the use of power conferred by the state—it is something any citizen may do.  It therefore cannot be adverse action for the purposes of First Amendment retaliation.

13

Second, even if filing the lawsuit was an adverse state action, it cannot be sufficiently grave to deter exercise of free speech rights because Wells and Jarrell did not know about it until much later. An injury of which they were not even aware cannot deter them and thus cannot support a retaliation claim. (Doc. # 32 at 4) ("Plaintiffs do not and cannot explain how a lawsuit could possibly chill their First Amendment rights when they were not even aware of its filing."). Therefore, Wells and Jarrell have failed to allege a prima facie case that Rice's filing of a lawsuit constituted adverse action taken in retaliation for their protected speech.

### ii. Rice's Threat

Second, Wells and Jarrell argue that Rice's threat that he would "come for" them if anything happened to his wife or his children because of Wells's post constituted an adverse action because it placed them in fear for their safety and personal freedom as a result of their speech. (Doc. # 30 at 19-21). Rice argues that these comments were too vague and were not made because of Wells's post, but because of his justified fear for his family's safety based on the social climate and what he knew about Jarrell's past. (Docs. # 29 at 10-11 and 32 at 5-6). Rice's comments, viewed through the lens of the Sixth Circuit caselaw and the setting at the time, could be viewed by a reasonable jury as a threat directed toward Plaintiffs because of their protected speech.

As discussed earlier, to be actionable under § 1983, an adverse action must be more than *de minimis*—it must be sufficiently severe as to deter a person of reasonable firmness. *Bart*, 677 F.2d at 625. However, this does not mean that some kind of tangible, physical harm must be suffered before a tort is redressable under § 1983. In fact, as Rice himself noted in his Motion, "[e]ven a threat may satisfy this standard, if the threat may

deter the protected conduct." (Doc. # 29 at 10) (citing *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010)). The test is whether the conduct "is *capable* of deterring a person of ordinary firmness . . . [a]*ctual* deterrence need not be shown." *Id*. (emphasis in original) (internal quotations omitted). "Moreover, because 'there is no justification for harassing people for exercising their constitutional rights,' the deterrent effect of the adverse action need not be great in order to be actionable." *Hill*, 630 F.3d at 473. This standard is not meant to present a great hurdle to plaintiffs; it only exists to "weed out . . . inconsequential actions." *Thaddeus-X*, 175 F.3d at 399. "On multiple occasions, [the Sixth Circuit has] held that when an official responds to speech with threats of physical harm, that response constitutes an adverse action that would deter a person of ordinary firmness from speaking." *MacIntosh*, 69 F.4th at 316.

During the June 16 meeting with Wells, Jarrell, Chief Muse, and the County Attorney, Rice stated: "I'll tell you this, and I'm not going to hold any punches here, if somebody harms one hair on my wife or any of my kids, if anybody harms one hair on their head, I'm coming for you and I'm coming for you." (Doc. # 26 at 47). In the context of Rice's original comment to Jarrell, the deep tensions between police and citizens at the time, and Rice's statement while acting as a Maysville Police officer, a reasonable jury could find that this statement was a threat of bodily harm against Wells and Jarrell if anything happened to his family. In short, it was a threat to use the power of his office—or at the very least, his skills as a police officer—to punish Wells and Jarrell for any effects coming from their speech.

It is hard to imagine a more volatile environment than the two weeks during which these events transpired. The black community in Maysville was justifiably angry at the

15

May 25, 2020, murder of George Floyd by Minneapolis police officer Derek Chauvin after Chauvin kneeled on Floyd's neck for almost nine minutes. (Doc. # 30 at 1). Caught on video and spread over the internet, the murder sparked worldwide outrage and a nationwide wave of criticism over police tactics and training. In this context, the citizens of Maysville conducted an entirely peaceful protest on June 1, 2020. (*Id*. at 2). Later that night, during a second protest, Rice commented to Jarrell that the crowd's behavior "is why we've got officers kneeling on necks." (*Id*.). The parties strenuously disagree on the context, but whatever the context was, Jarrell was offended and abruptly left the conversation. (*Id*. at 2-3). Wells then posted about it on Facebook. (*Id*. at 3). Rice, at a June 16 meeting that degenerated into yelling and swearing, pointed at Wells and Jarrell and assured them that he would be coming for them if anything happened to his family. (*Id*. at 8). In context, it is difficult to read Rice's comments as anything other than a threat to harm Wells and Jarrell—or at least arrest or detain them—should anything happen to his family as a result of Wells's post. A jury could certainly come to such a conclusion.

This is kind of threat from a police officer is "*capable* of deterring a person of reasonable firmness." *Hill*, 630 F.3d at 472. The fact that Wells and Jarrell possessed more than average fortitude is irrelevant.[4] As is Rice's fear for the safety of his family. (Doc. # 29 at 10-12). Rice cites no caselaw that allows threatening statements against citizens if a police officer has a reasonable fear. (*Id*.). While it is true that "vague threats of unspecified harm do not constitute adverse actions" (Doc. # 29 at 11) (citing *Harris v. Sowers*, No. 2;16-cv-888, 2020 WL 6823117, at *3 (S.D. Ohio Nov. 20, 2020)), this was

---

[4] Although Plaintiffs did not desist from their protected speech, they did admit to living in fear after Rice's statements. Wells did not go out in public or sit on her front porch, and Jarrell was also fearful for his own safety and that of his aunt. (Doc. # 30 at 20).

16

not a vague threat. Rice did not need to elaborate in detail on what exactly he would do to Wells and Jarrell were his family harmed. A reasonable person could easily view his statements to mean that he would use the force of his office and his skills to harm Wells and Jarrell, possibly even in the way he had commented on to Jarrell and which the Maysville residents were protesting. And while it is not dispositive, Chief Muse and the City of Maysville certainly thought Rice's behavior actionable under city ordinances prohibiting making "inappropriate" statements "that could be perceived as a threat" or "as threatening." (Doc. # 30 at 20). The Court believes that a jury could reasonably conclude that Wells and Jarrell suffered an adverse action when Rice stated that he would "come for them." Therefore, they have established this element of their prima facie case.

### 3. Causal Connection

Finally, Wells and Jarrell must show a causal connection between the adverse action[5] taken against them and their protected speech. To make this connection, they must show that "the defendant's subjective motivation for taking the adverse action was at least in part to retaliate against the [plaintiff] for engaging in protected conduct." *Hill*, 630 F.3d at 475. Rice argues that he made these threats based on his fear for his family's safety and not to retaliate against Plaintiffs for their protected speech.

This is a difference without a distinction. The root behavior that Rice seeks to exact retribution for is the Facebook post. This is the constitutionally-protected conduct that allegedly causes him to fear for his family's safety and which he wishes to suppress. The Court does not see any plausible argument that in making the threat Rice shifted his

---

[5]  Wells and Jarrell could easily prove causation with reference to the lawsuit; Rice explicitly said that he filed it because Wells would not take down her post. (Doc. # 30-4 ¶ 20). But because that was not state action, it has already failed at the adverse action prong of the analysis.

17

actions from trying to suppress the Facebook post to a desire to protect his family. At the very least, a jury could easily find such causation.

Wells and Jarrell have adequately established all three prongs of their First Amendment retaliation claim on the basis of Rice's threats at the June 16 meeting. However, they failed to allege an adverse action on the basis of Rice's lawsuit because that was not an action taken under color of state law. Therefore, Rice's Motion for Summary Judgment will be **granted in part** and **denied in part**.

### C. Qualified Immunity

Rice also argues that he is entitled to qualified immunity.[6] Qualified immunity protects certain officials from suit when they perform discretionary functions "unless their actions violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harless v. City of Columbus*, 183 F. Supp. 2d 1024, 1031 (S.D. Ohio 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This boils down to a two-step inquiry examining (1) whether a constitutional right has been violated, and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009). To be "clearly established," a right must be defined in "a more particularized, and hence more relevant, sense." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

"At the time of this incident, it was clearly established that citizens have a First Amendment right to criticize government officials, and that an official's retaliation against a citizen for having exercised that right violates 42 U.S.C. § 1983." *Harless*, 183 F. Supp.

---

[6] Qualified immunity is not relevant to Plaintiffs' claim based on Rice's lawsuit because, as discussed, that was a private action and the immunity only applies to those exercising public functions. Additionally, that claims fails as a matter of summary judgment based on the lack of an adverse action.

2d at 1031. It has been long established that the people may criticize their government, and it necessarily follows that they cannot be threatened for such speech. "The law is well settled in this Circuit that retaliation under color of law for the exercise of First Amendment rights is unconstitutional, and retaliation claims have been asserted in various factual scenarios." *Zilich*, 34 F.3d at 365 (quotations omitted) (collecting cases). Immunity should not be recognized where such basic rights are implicated. *See Mumford v. Zieba*, 4 F.3d 429, 432 (6th Cir. 1993). The facts of this case can easily be taken to describe "a visceral threat of harm made clear by the context of the parties' discussion of political violence." *MacIntosh*, 69 F.4th at 320. Therefore, Rice's request for qualified immunity must be **denied**.

### III.    CONCLUSION

Thus, for the reasons articulated herein, **IT IS ORDERED** that:

(1) Defendant's Motion for Summary Judgment (Doc. # 29) is **granted** insofar as Plaintiffs seek to challenge Defendant's filing of a defamation lawsuit;

(2) Defendant's Motion for Summary Judgment (Doc. # 29) is **denied** insofar as Plaintiffs seek to challenge Defendant's statements at the June 16 meeting;

(3) The parties shall file a **Joint Status Report within thirty (30) days from the date of entry of this Order** indicating whether they would be amenable to pursuing mediation, either privately or court-facilitated, on the remaining claim.

This 15th day of September, 2023.



Signed By:
*David L. Bunning*  DB
United States District Judge